IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LESLIE M. PARTEM, M.D., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO. 06-cv-2019 |
| | : | |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | : | |
| ET AL., | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

### AFFIDAVIT OF IMMEDIATE AND IRREPARABLE INJURY

COMMONWEALTH OF PENNSYLVANIA:
: ss.
COUNTY OF PHILADELPHIA          :

LESLIE M. PARTEM, M.D., being duly sworn according to law, depose and say as follows:

1. I am the plaintiff in the above-captioned action.

2. I am a naturalized citizen of the United States. Prior to coming to the United States I lived in the former USSR where I and my family had been persecuted by the communists, resulting in my decision to flee to the United States to start a better life. On September 24, 1991 I came to the U.S. and was reunited with my daughter, on October 15, 1994, age 11, and was sworn in as a U.S. citizen on February 9, 2000. I am a single mother. The transition has not been easy, but my ambition to become a practicing doctor in the United States has acted as a backbone in my life, and my drive and determination to accomplish this goal have carried me through the difficult times. If I am

not successful in achieving that goal, my daughter and I will have to face some difficult options, including the possibility of having to return to the Ukraine, where I am licensed to practice medicine, in a country where our lives are still in danger. In fact, my father was in a Siberia work camp and penal battalion on the Sakhalin Peninsula and the island of Korsakov for seven (7) years and his brother was killed by the communists.

3. I obtained my M.D. degree, with specialization in obstetrics and gynecology, from the Lviv Medical University (currently known as the Danylo Halytsky Lviv State Medical University) in the former Soviet Union. In addition, I attended the Kiev National Medical University and later the prestigious Soviet Institute of Advanced Medical Specialties (also known as the Kiev State Institute for Advanced Training of Physicians of the USSR Ministry of Health), graduating with an advanced diploma in OB/GYN. I was an OB/GYN in the former U.S.S.R. for thirteen (13) years (altogether).

4. On July 1, 2004 I obtained a graduate medical license and on July 1, 2004 I entered into a contract for my graduate medical training at the Bryn Mawr Hospital in Bryn Mawr, PA. I am currently in my second year of the Family Practice Residency Program at that Hospital.

5. On July 7, 2003, I successfully completed the Frankford Hospital Transitional Year Residency Program with exemplary remarks.

6. Since coming to the United States, I have held a number of jobs to support myself and my daughter while engaged in my U.S. medical training and preparing for my licensure examinations. For instance, I have been involved in laboratory research for Thomas Jefferson University. There I held a position as head of the Histotechnology Laboratory and prepared teaching and research materials for Human Histology and

Neuroanatomy courses. I also held a position as a research assistant and was in charge of the Molecular Biology Laboratory in the Thomas Jefferson University Department of Emergency Medicine. I have also done volunteer work in that department, and have attended the Family Medical Ground Rounds at Jefferson, earning a total of 48 credits to date.

7. To receive an unrestricted license to practice medicine in the Commonwealth of Pennsylvania, and in virtually all other states, a physician must receive a passing score on all three steps of the United States Medical Licensing Examination (hereinafter "USMLE"), which is jointly administered by the National Board of Medical Examiners ("NBME") and the Federation of State Medical Boards ("FSMB"). In Pennsylvania, the licensing authority, the State Board of Medicine, delegates to the NBME the function of determining what constitutes a passing score on the USMLE. The NBME and FSMB jointly establish rules for the USMLE, and the scoring of the USMLE. The determination of what constitutes a passing score, and the establishment of standard errors of scoring measurement, are determined by the NBME. USMLE scores are reported by the NBME to individual medical licensing authorities of the various jurisdictions in the United States and its territories. In Pennsylvania, all three (3) steps must be passed within seven (7) years from the date the Step 1 examination is taken.

8. I took and passed Steps 1 and 2 of the USMLE on October 2, 1998 and April 20, 2000, respectively. Having begun my USMLE testing in October, 1998, my 7-year period under Pennsylvania law for completing all three steps of the USMLE ended in December, 2005.

9.  On December 9, 2003, I took Step 3 of the USMLE for the first time, and did not obtain a passing score. On December 16, 2004, I took Step 3 of the USMLE for a second time, and did not obtain a passing score. On July 5, 2005, I took Step 3 of the USMLE for a third time, and did not obtain a passing score. On December 5, 2005, I took Step 3 of the USMLE for a fourth time (for purposes of licensure in the State of Delaware) and did not obtain a passing score. Finally, I took step III of the USMLE for the 5th time on May 1, 2006 and received an identical score of 74% and 183 respectively, failing by 1 point for the 3rd time.

10. On the July, 2005 Step 3 examination, the NBME gave me scores of 74 (overall exam performance) and 182 (Step 3 exam performance) on a scale in which the NBME defined scores of 75 and 184, respectively, as passing. On the December, 2005 Step 3 examination, the NBME gave me scores of 74 (overall exam performance) and 183 (Step 3 exam performance) on a scale in which the NBME defined scores of 75 and 184, respectively, as passing. In the May 2006 examination, the NBME once again gave me a score of 74 and 183, respectively (please refer to copy). Each time, had the NBME given me a score of 75, rather than 74, I would have passed the examination. I thus lost my opportunity for licensure by one (1) point.

11. The USMLE Step 3 examination is administered by computer at designated testing centers. It consists of two parts: a timed multiple choice response part, and a timed part for responses to computer-based case simulations ("CCS"). I challenge the correctness of the NBME's scoring of my responses to two (2) of the CCS simulations on the July, 2005 examination, one of which involved urology issues, the other, cardiovascular surgery issues (patient with TIA). The NBME informed me that I

4

gave incorrect responses to these two (2) CCS simulations. I have obtained the opinion of an outside expert medical consultant, Leigh S. Bergmann, M.D. of the Bryn Mawr Urology Group, to support my contest. He has provided my attorney and I with a written report supporting the correctness of my responses. Had my responses to one or both of these CCS simulations been deemed by the NBME to be correct, I would have achieved sufficient credit to be given a passing score on the Step 3 examination.

12. In various letters and other communications from myself and my attorneys, I have asked the NBME to reevaluate and rescore my responses to the two CCS case simulations at issue. The NBME has steadfastly refused to do so. In response to communications from myself and my attorneys, the NBME stated that the responses to the CCS simulations which I contest were not counted in determining my final score. I do not believe this to be true for the following reasons:

(a) *Credibility Problem:* Dr. Partem was used as a **guinea pig for the testing service**, a commercial enterprise. This exploitative and fraudulent behavior. Due to the astounding number of errors caused by the USMLE services in the implementation of its examination products (upon which Dr. Partem's professional career depends) it is clear that the competence of the Board is under question and one must wonder about not only the quality of questions presented, but the extent of the pool form which they were drawn and the credentials of those creating such questions. The Board must give all examinees **access to the questions** (after the examination) so that defective questions can be challenged. This requires

5

a reasonably large pool of new questions for each examination. If the Board cannot provide such a pool, it has failed.

(b) *Lack of Quality Control:* The USMLE Board acknowledges that the two questions (on urine collection and endarterectomy) identified by Dr. Partem as flawed, **were indeed defective**. Thus, the examination was a **defective commercial product** due to the fact that Dr. Partem clearly identified **two flawed questions**, which were later withdrawn and declared non-counting "pretest questions" by the National Board of the Examiners. Based on the evidence presented by Dr. Partem, it is clear that at least two of the questions were faulty. This proves that *Dr. Partem knew her material,* as she is the one who identified this faulty material. Had the detection of only one of these two questions been given credit for, Dr. Partem would have passed the examination. However, she "failed" because of one point, respectively.

(c) *Defective Questions:* Dr. Partem identified in the examination of July 5-6, 2005, and December 5-6, 2005 a total of three flawed questions that she can remember. This raises the question how many other flawed questions may have been used in these examinations. By withdrawal of the two questions identified by Dr. Partem in the July examination, the USMLE Board acknowledges that is does not have appropriate quality control.

(d) *The improper use of SEM.* The Board must provide evidence that the **basis of the statistics applied** to each examination is appropriate. In particular, it must prove that the N used in the calculations is of sufficient

6

        size and homogeneous. Furthermore, the Board must explain why it does not apply the SEM in favor of the examinees.

    (e)    *Persecution and Damages*: This careless implementation of the examination by the Board has caused severe professional, financial and health-related problems for Dr. Partem and her daughter. The USMLE Board is responsible for the compensation for all damages that have been caused and others that may yet ensue as a consequence of its actions or lack thereof.

If, in fact, Dr. Partem's responses to the two contested CCS simulations were not counted, such practice undermines the content validity of the examination. On these issues, Dr. Partem assisted by another expert consultant, August Epple, Ph.D., Emeritus Professor of Pathology, Anatomy and Cell Biology at the Thomas Jefferson Medical College. Dr. Partem worked under Dr. Epple's supervision during her aforementioned time at Thomas Jefferson. He has worked closely with Dr. Partem in her efforts to seek redress.

    13.    Dr. Partem believes that her national origin may be a factor in the NBME's above-referenced actions. Her reasons for believing this include the following:

    (a)    *Ethnic Discrimination*: When Dr. Partem took the USMLE Clinical Skills Assessment on December 15, 2000, the participants were given cloth bands to be worn on the arm. Dr. Partem's band was pink, while the bands of all other participants in the examination were blue. Dr. Partem demanded an explanation, but was told not to worry since the color of the band had no significance. Dr. Partem failed the examination though

        she felt that she had done very well. After all, she had 13 years of experience as gynecologist in the former USSR. In 2000, Dr. Partem was too naïve to pursue the matter.

(b)    The inability of the Board to disclose its official list of members. This reluctance adds to the credibility problem the Board is already facing.

(c)    Despite Dr. Partem's clear identification of **two flawed examination questions,** and the Board's subsequent acknowledgment that the two questions (on urine collection and endarterectomy) identified by Dr. Partem **were indeed defective,** the Board continues to refuse to credit Dr. Partem's findings. In addition, it rejects all probabilities of more defective questions being present, which also could have altered the examination score. Furthermore, this steadfast denial by the Board of any wrongdoing (despite clear identifications of its obvious failures in delivery of an error-free product) and its continued secretive manner of handling the situation suggests that the credibility of the Board is to be questioned. The Board must give all examinees **access to the questions** (after the examination) so that defective questions can be challenged. This requires a reasonably large pool of new questions for each examination. Since the Board has not followed a transparent course of action or disclosed the questions used, some sort of manipulation by the Board can be presumed.

(d)    Identical results in three consecutive USMLE Step 3 examinations of 74% (with the question break-down categories by different sections also in suspicious resemblance)

14. In April, 2006, my attorney wrote a letter to the Pa. State board of Medicine requesting a determination by the Board that I be deemed to have passed Step 3 of the USMLE, administered in July, 2005, for purposes of applying for a license without restriction via endorsement pursuant to 49 Pa. Code §17.2(a). Alternatively, in that letter my attorney requested that the Board promptly refer the matter for a hearing for purposes of receiving and evaluating my evidence concerning the 2005 administration and scoring of my USMLE Step 3 examinations, and deciding whether said evidence warrants (1) waiver by the Board of the requirement of 49 Pa. Code §17.12c(b); and (2) the Board's granting of leave to me and Bryn Mawr Hospital to apply for licensure by Board endorsement pursuant to 49 Pa. Code §17.2(a). The State Board of Medicine denied my attorney's requests. Thus both the State Board of Medicine and the NBME have denied my requests for a hearing to consider the merits of my claims concerning the Step 3 examination.

15. By letter dated February 27, 2006, the Program Director of the Bryn Mawr Hospital Family Practice Residency Program informed me that at its February 14, 2006 meeting, the Hospital's Graduate Medical Education Committee voted not to renew my employment agreement for the fiscal year 2007 academic year for continued graduate medical education training. The letter states that the sole reason for the decision is the fact that I did not "…successfully complete USMLE 3 within eighteen (18) months of the start of your training program." As a result, my employment agreement at the Bryn Mawr Hospital ends on June 30, 2006, and I will be unable to commence the third year of the Family Practice Residency Program at that Hospital. If this occurs, I will be immediately and irreparably harmed in the following respects:

(a) Dr. Partem's reputation had been devastatingly damaged since the "Failed" results from the Step 3 Examinations. The continuation of her residency program has come into question and despite her extensive medical experience in both the clinical and research settings, and her excellent evaluations over many years which attest to her excellent medical abilities, because of the refusal of the Board to correct its acknowledged mistakes in not only the exam administration and implementation processes, but also in providing an error-free product (upon which people's livelihoods and careers depend on), her medical career is at stake. The negligence by the Board is simply astounding.

(b) *Persecution and Damages*: This careless implementation of the examination by the Board has caused severe professional, financial and health-related problems for Dr. Partem and her daughter. The USMLE Board is responsible for the compensation for all damages that have been caused and others that may yet ensue as a consequence of its actions or lack thereof.

(c) Dr. Partem's daughter has been severely impacted by this process and has had to live under these constant and recurring stressful conditions, while trying to effectively study and graduate from her respective university. Since the Board's negligence has caused Dr. Partem to potentially lose the renewal of her contract, Dr. Partem's daughter has had to live with the stress knowing that her sole provider is in danger of losing her job. Her mental health and stability have been further undermined due to living

under the constant fear of not having the ability to graduate from her university, since the possibility of her mother unjustly losing her job was all too real. These events have truly caused great instability in the life of Dr. Partem and her daughter.

16. To prevent the above-referenced harm from occurring to Dr. Partem, we need an immediate Court Order directing the defendants in this lawsuit to do, or to refrain from doing, the following:

(a) Dr. Partem took the examination in the belief that all questions had been checked carefully. However, after she had identified **two flawed questions**, these were withdrawn and declared non-counting "pretest questions." This proves that Dr. Partem knew her material. It is the job of the Board to provide an error-free examination (as people's lives and careers depend on even a single point, thus one minor error can cause an unjust termination of one's career). Had the detection of only one of these two questions been given credit for, Dr. Partem would have passed the examination. However, she "failed" because of one point, respectively.

(b) If the service takes the prerogative to withdraw two faulty questions, then basic fairness demands that Dr. Partem be given the **privilege to exclude two questions** which she answered wrongly. Under this condition, she would have passed the examination.

(c) Dr. Partem identified in the examination of July 5-6, 2005, and December 5-6, 2005 a total of three flawed questions that she can remember. This raises the question how many other flawed questions may have been used

in these examinations. By withdrawal of the two questions identified by Dr. Partem in the July examination, the USMLE Board acknowledges that it does not have appropriate quality control. It is obvious that the USMLE Board has a **credibility problem.** To remedy this situation, the Board must give all examinees **access to the questions** (after the examination) so that defective questions can be challenged.

(d)  The Board must provide evidence that the **basis of the statistics applied** to each examination is appropriate. In particular, it must prove that the N used in the calculations is of sufficient size and homogeneous. Furthermore, the Board must explain why it does not apply the SEM in favor of the examinees.

(e)  Dr. Partem's medical career may be ruined because she had to take the July 2005 examination with a handicap due to mismanagement by the USMLE Board. In addition, she was correct in an examination that was altered *post factum* so that she could not pass by one point and two points, respectively. The unwillingness of the USMLE Board to be fair to her is difficult to comprehend and is obviously **not based on her performance**. An inquiry in this matter seems indicated.

(f)  The examination was a **defective commercial product** which caused Dr. Partem and her daughter severe professional, financial and health-related problems. The USMLE Board is responsible for the compensation for all

damages that have been caused and others that may yet ensue as a consequence of its actions or lack thereof.

_Leslie M. Partem_
_____
Leslie M. Partem, M.D.

Sworn to and Subscribed

Before me this 5th day

Of June 2006.

_____
NOTARY PUBLIC

Notarial Seal
Janet Harper, Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires Mar. 24, 2007

Member, Pennsylvania Association Of Notaries

13