IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                    )
LESLIE M. PARTEM, M.D.,             )
                                    )
            Plaintiff,              )      CIVIL ACTION
                                    )
        v.                          )
                                    )
NATIONAL BOARD OF MEDICAL           )      NO. 06-CV-2019
EXAMINERS, et al.,                  )
                                    )
            Defendants.             )
_____)

**ORDER**

        AND NOW, this      day of                    , 2006,

upon consideration of the Motion for a Preliminary Injunction of

Plaintiff Leslie M. Partem, IT IS HEREBY ORDERED that the motion

is DENIED.

                            BY THE COURT:


                            _____
                            William H. Yohn, Jr., J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
_____
                              )
LESLIE M. PARTEM, M.D.,       )
                              )
            Plaintiff,        )    CIVIL ACTION
                              )
        v.                    )
                              )
NATIONAL BOARD OF MEDICAL     )    NO. 06-CV-2019
EXAMINERS, et al.,            )
                              )
            Defendants.       )
_____)
```

**DEFENDANTS', NATIONAL BOARD OF MEDICAL EXAMINERS AND FEDERATION
OF STATE BOARD OF STATE MEDICAL BOARDS, INC., MEMORANDUM IN
<u>OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

Defendants, National Board of Medical Examiners ("NBME") and Federation of State Medical Boards of the United States, Inc. ("FSMB"), oppose plaintiff's unprecedented motion, which attempts to have this Court rewrite and rescore a highly sophisticated, scrutinized and professional test that is accepted by every state to assess minimum proficiency for the practice of medicine. Plaintiff, who has since 1997 failed various parts of this test no less than 13 times, and the Step 3 examination about which she is currently complaining 5 times, should not be permitted to obtain the extraordinary remedy of a preliminary injunction.

I.    **INTRODUCTION**

All prospective physicians with an M.D. degree[1] must pass The United States Medical Licensing Examination (the "USMLE™") in order to practice medicine in the United States. 96 percent of all candidates who receive their medical degrees from schools in the United States and Canada pass the Step 3 examination, about which plaintiff complains, the first time they take it.[2] Apparently frustrated by her repeated inability to pass this examination, plaintiff has sued the NBME and FSMB, which co-own and co—sponsor the USMLE™.[3] She blames them for damaging her medical career and reputation by refusing to award her the passing score she did not merit on the July 2005 USMLE™ Step 3 examination.

The NBME convenes committees that comprise hundreds of medical educators and physicians to develop, test and refine the USMLE™. The committees of medical educators and expert physicians painstakingly craft the examination questions and set minimum passing scores. These medical experts spend countless hours on the examination so that licensing authorities nationwide may rely on it to establish a common minimum standard

---

[1] Doctors with a D.O. degree may take the USMLE™ or a similar examination called the Comprehensive Osteopathic Medical Licensing Examination ("COMLEX-USA"). The COMLEX-USA examination is not open to physicians with M.D. degrees.

[2] 74% of examinees with medical degrees from schools outside of the United States and Canada have during the same time period passed the Step 3 examination on their first attempt. USMLE™ performance data, p.4 (Exhibit 9)

of professional competence necessary to the unsupervised practice of medicine in this country.

Through this lawsuit and the preliminary injunction she seeks, Plaintiff asks this Court to second-guess the complex, specialized and time-consuming work of hundreds of medical, statistical and testing experts used by the NBME and FSMB. Despite her numerous failures, she seeks to lower the USMLE™ standards so that she can pass the examination and practice medicine without supervision. Plaintiff's frustration with USMLE™ does not remotely justify the extraordinary injunctive remedy she now asks this Court to impose.

## II. FACTS

### A. The USMLE™ Plays A Critical Role to Ensure That the Physicians Who Obtain Licenses to Practice Medicine in the Country Have the Minimum Skills Necessary to Provide Safe And Effective Patient Care.

The USMLE™ plays a critical role in determining whether examinees are qualified to receive medical licenses. Every state medical (M.D. only) and composite (M.D. and D.O.) board in this country relies on the USMLE™ to assess the qualifications of examinees seeking medical licenses so that those who pass the examination have the requisite cognitive, clinical and communication skills necessary to provide safe and effective medical care. The importance of the USMLE™'s function

---

[3] Plaintiff also has sued the Commonwealth of Pennsylvania.

4

cannot be overstated.  Doctors hold peoples' lives and health in their hands.

The USMLE™ has three parts: Step 1, Step 2 and Step 3. The examination at each step evaluates whether a doctor possesses the knowledge and skills essential to practice safe and effective medical care.  Step 1 assesses whether an applicant can understand and apply basic scientific principles to medical practice.  Step 2 assesses whether an applicant can, under supervision, understand and apply clinical science integral to patient care.  Step 3 assesses whether an applicant can understand and apply biomedical and clinical science necessary to practice medicine without supervision.  2005 Bulletin of Information (Exhibit 7), pp.1-2.

**B.    The USMLE™ Is The Product Of Hundreds Of Experts Nationally Who Engage In A Careful Examination Development Process.**

The USMLE™ is the product of a nationwide effort of many experts who go through a careful process over countless hours to develop the content of each step of the examination and decide the minimum passing scores.  <u>NBME Examiner</u>, Vol. 48, No.2, pp.1-2 and 5 (2001) (Exhibit 10) (the "<u>Examiner</u>").

Education committees comprising medical educators and clinicians from across the country are responsible for the design of the step examinations, development of examination materials and setting of minimum passing scores.  There are

approximately 35 committees performing these functions, with over 300 members.  The committee members are from many different practice settings, including "medical schools, practicing physicians and physicians representing licensing boards." Examiner, Exhibit 10, p. 1.

The committees that develop the USMLE™ questions and material include participants who represent the interests of the medical profession, the public and foreign medical graduates, like plaintiff:

> The USMLE is governed by a Composite Committee, a body with membership from the [NBME], [FSMB], the Educational Commission for Foreign Medical Graduates, and the American public.  The Composite Committee delegates many responsibilities for the Steps to the respective Step committees, which, in turn, oversee test material development and item review committees.  The Step committees include current and former members of the item review committees, plus at-large members who might be medical school deans, representatives of state medical boards, and others with experience and interest in medical education and medical licensing.  The responsibilities of the Step committees include approval of the content specifications for the examination, the number of test questions or problems in each content area, and the minimum passing score.
>
> The test material development committees develop examination materials . . . .

Examiner, Exhibit 10, p. 1.

The NBME provides instruction in test development to the committee members who create the questions for the examination.  The committee members in turn utilize their

own expertise, and share techniques for developing test questions with other committee members who possess complimentary specializations. Examiner, Exhibit 10, pp. 1 and 5.

The committees do not just write examination questions that then appear on a test. Before being added to the USMLE™ and scored, every test question undergoes thorough analysis and review. Each prospective test question's reliability is assessed "pre-test," and is included in examinations under actual test conditions without being scored:

> The committee members are given assignments to develop questions or problems in areas in which they have expertise. After they complete these assignments, NBME staff members review and revise the proposed examination materials as needed, to ensure adherence to high quality and a consistent format and style, and to prepare them for subsequent review. Test material development committee members come together at meetings at the NBME to critically appraise each test question or problem. They revise or discard any materials that are in doubt. Further review of these materials occurs when item review committees scrutinize them within the context of how test takers perform on each question or problem. Only after all reviews have been conducted does a particular question or problem appear as a scored item in the examination.

Examiner, Exhibit 10, p. 5.

Great care is taken in setting the standard (i.e., minimum passing score) for each Step examination. Each USMLE™ Step has a committee of physicians, clinicians and medical

educators charged with oversight and responsibility for content of their respective Step and establishing its standard:

> Setting the minimum passing score, which is done approximately every three years for each Step, also involves medical school faculty, practicing physicians, and representatives of medical licensing boards. Groups of these individuals meet to review previously used examination materials and make judgments on how a test taker at the minimum passing level would have done on each question or problem. With the use of psychometric techniques, a tentative minimum passing score based on these expert judgments is developed. Additional information is obtained through a survey of deans, faculty, students, and other stakeholders; they are asked to state their opinions about appropriate passing rates on that Step. . . .

Examiner, Exhibit 10, p. 5.

The final USMLE™ reflects the expertise and efforts of numerous professionals involved in all aspects of this rigorous process.

**C.   NBME And FSMB Set A Reasonable and Minimum Standard For USMLE™ Examinees And Strongly Support Them In Their Examination Preparation**

**1.   Statistical Data On Pass Rates Demonstrate That the USMLE™ Is A Reasonable Test**

The USMLE™ does not impose an unreasonable burden on examinees. The NBME and FSMB set a reasonable minimum standard of skill and knowledge. Examiner, Exhibit 10, p. 5. ("Groups . . . meet to review previously used examination materials and make judgments on how a test taker at the minimum passing level would have done on each question or problem."). The statistical

analysis under which the test is scrutinized demonstrates the purpose of the USMLE™ to assess minimum proficiency.

In 2004 and 2005, 96% of examinees with medical degrees from United States and Canadian schools, and 93% of examinees with osteopathic degrees from United States and Canadian schools, passed the Step 3 examination on their first attempt.  USMLE™ performance data, p. 4 (Exhibit 9).  During the same years, 74% of examinees with medical degrees from schools outside of the United States and Canada passed the Step 3 examination on their first attempt.  Id.

These high passing rates support the reasonableness of the collective judgment of the medical experts who set the minimum passing scores.  Plaintiff has failed the Step 3 examination five separate times.

**2.   NBME And FSMB Strongly Support Examinees In Their Preparation For The USMLE™**

The NBME and the FSMB provide extensive information to examinees about the USMLE™ to help orient and prepare them for the examination.  Exhibits 7 and 8 are the 2005 and 2006 Bulletins of Information, which painstakingly explain every aspect of the examination: the application process; scheduling; examination contents; taking the examination; and scoring.

The Bulletins of Information also explain that the examinations include pretest materials that will not be used in scoring the examination and advise examinees what to do if they

experience a problem during the administration of the examination.  2005 Bulletin of Information, Exhibit 6, pp. 26 and 33; 2006 Bulletin of Information, Exhibit 7, pp. 27 and 34.

The Step 3 Content Description and Sample Test Materials (Exhibit 8) provides nearly 90 pages of explanation about Step 3, sample examination questions and an answer key so examinees can assess their preparedness.

**D.   Plaintiff Failed The USMLE™'S Three Steps 13 Times.**

Plaintiff has cast herself as one point away from a medical license, but her distance from a medical license is far greater.  Plaintiff has failed the various USMLE™ steps 13 times since 1997 and has failed the Step 3 examination itself five times.  The tables below show her examination history, and are based on her USMLE™ test records (Exhibit 4).

**Step 1 Examination Results**

| EXAM DATE | RESULT |
|---|---|
| June 10, 1997 | Failed |
| October 14, 1997 | Failed |
| June 9, 1998 | Failed |
| October 20, 1998 | Passed |
| | **FAILED 3 TIMES** |

**Step 2 Examination Results**

| EXAM | RESULT |
|---|---|
| August 26, 1997 | Failed |
| March 3, 1998 | Failed |
| August 25, 1998 | Failed |
| March 2, 1999 | Failed |
| December 2, 1999 | Failed |
| April 20, 2000 | Passed |
|  | **FAILED 5 TIMES** |

**Step 3 Examination Results**

| EXAM | RESULT |
|---|---|
| December 9, 2003 | Failed |
| December 16, 2004 | Failed |
| July 5, 2005 | Failed |
| December 5, 2005 | Failed |
| May 1, 2006 | Failed |
|  | **FAILED 5 TIMES** |

**E.    Not Only Did the NBME and FSMB Properly Administer And Score Plaintiff's Step 3 Examination, But They Also Thoroughly Investigated And Evaluated Her Complaints and Determined They Were Unfounded.**

The NBME and FSMB assure examinees that they will entertain complaints concerning examinations and will thoroughly investigate, evaluate and remediate any problem they determine is legitimate.

Plaintiff utilized this process to complain about her July 2005 Step 3 examination. Her complaints ranged from concerns about access to her files, to criticisms of examination questions, to a computer problem she supposedly experienced.

The NBME and FSMB thoroughly investigated and evaluated each of her complaints and found them to be meritless. Exhibit 5 is chronologically arranged correspondence between NBME and FSMB and plaintiff and her lawyers. The correspondence shows that the NBME and FSMB investigated, evaluated and addressed in writing each concern that plaintiff raised.

For example, plaintiff attacked two computer-based Case Simulations on her test as improper. NBME's August 30, 2005, letter explained that the simulations were "non-scored, pre-test material," which means they were questions in development that the NBME did not count in scoring the examination. Letter dated August 30, 2005, Davis to Partem (Exhibit 5, Bates No. N&F 00049).

The complaints that plaintiff raises about the examination that she repeatedly failed simply lack merit.

**F. Plaintiff's Statistical Argument That She Should Pass the Step 3 Examination Because Of The Standard Error Of Measurement Is Preposterous.**

The USMLE™ sets a uniform standard that establishes a minimum competency level required for the practice of medicine. It is imperative that there be an unambiguous line between passing and failing. The NBME and FSMB have devoted an exorbitant amount of resources to establish and implement a fair and psychometrically valid process for determining an appropriate passing score that reflects a minimum standard for competence in the medical profession. Plaintiff seeks to have this Court establish a new standard just for her, after her fifth failed attempt at passing the Step 3 examination.

Plaintiff argues she passed the July 2005 Step 3 examination because her score was within the three to seven point standard error of measurement ("SEM") for that examination. Plaintiff misunderstands the true nature of the SEM by presuming that her true level of performance is higher than her reported score. The SEM is a statistical construct that estimates how much an examinee's score might vary—higher or lower--if there were a way to test repeatedly that same individual with comparable sets of test items. If plaintiff's argument were accepted, the passing score would be substantially

lower.  See April 26, 2006, letter St. John to Finch (Exhibit 5, Bates Nos. N&F 00065-N&F 00066)(responding to Plaintiff's SEM argument).

The committees who select and monitor minimum passing standards for USMLE™ examination are provided with SEM-related information along with information from other sources including the independent review of examination content and the results of surveys to stakeholders about their perceptions of USMLE™ standards.  All of this information is reviewed before the committee makes final decisions about passing requirements. Once the committee establishes minimum passing requirements, the NBME and FSMB apply those standards to all examinees taking that particular Step examination.  Accordingly, the numerous medical and statistical experts who have determined the appropriate pass-fail cutoff have taken into consideration the SEM in setting the appropriate passing score, which on five separate occasions, plaintiff simply failed to achieve.

**G.   The NBME And FSMB Are Private Entities Which Develop And Co-Own The USMLE™**

The NBME and FSMB are not agencies of any state or territory, nor are they licensure authorities for any state.

**1.   The NBME Is A Private Non-Profit Organization**

The NBME is a private, non-profit organization established in 1915.  Its principal place of business is in Philadelphia, Pennsylvania.  The NBME provides high-quality

examinations for the health professions and is committed to research and development in evaluation and measurement. Its mission is to protect the public health through state-of-the-art assessment of health professionals.

Policy for the NBME is governed by an 80 member National Board. Board members have expertise in health professions, medical education, medical practice and other subjects. The NBME is internationally known for its expertise in testing methodologies and evaluation in medicine. NBME Statement of Guiding Principles (from NBME Website). (Exhibit 1).

### 2.   The FSMB Is A Private Non-Profit Organization

The FSMB is a private, non-profit corporation established in 1912. Its principal place of business is in Euless, Texas. The members of the FSMB are the 70 allopathic, osteopathic and composite medical boards of the fifty states, the District of Columbia, Puerto Rico, Guam, the Virgin Islands and the Northern Mariana Islands. The FSMB provides support to its member medical boards to assist them in improving their practices and procedures for medical licensure and the discipline of physicians. The medical boards are both members of the Federation and its clients. The FSMB is governed by a board of directors, which is elected by its membership at their

annual meeting. FSMB Mission Statement (from its website)(Exhibit 2).

FSMB's mission is the continual improvement in the quality, safety and integrity of health care through the development and promotion of high standards for physician licensure and practice. Id.

### 3.   The NBME And FSMB Develop The USMLE™

The NBME and FSMB developed the USMLE™ and co-own and sponsor the examination. NBME Statement of Guiding Principles (Exhibit 1). Individuals who have or have had state licensing board experience are often included as members of the committees that guide and monitor the USMLE™. (Examiner, Exhibit 10, p. 1). Although these individuals bring the licensing perspective to USMLE™, they are not representatives of their state boards. The work of these committees and their decisions are based on the consensus of members who bring a variety of perspectives from medical education, clinical practice, and medical licensure. The ultimate decisions on USMLE™ issues are made by the NBME and the FSMB through the work done by these private, non-governmental committees.

### H.   The NBME And FSMB Set Their Own Standards For The USMLE™, But State Licensing Authorities Have The Ultimate Authority Regarding Medical Licensure.

The USMLE™ is administered and scored under standards and criteria established solely by NBME and FSMB, without any

control by the Commonwealth of Pennsylvania or state licensing boards (Agreement between the Commonwealth and FSMB, Exhibit 3, p. 2, ¶1).

Nevertheless, the medical licensing board of each state and territory has the sole discretion to determine the requirements for medical licensure within its jurisdiction (including the determination of what constitutes a passing grade on medical examinations) and to determine whether an applicant has met all of these requirements.  While the NBME and FSMB may provide information and recommendations (such as sample policies) to these medical licensing boards, the boards set the standards for licensure in their jurisdiction.  The medical licensing boards are free to accept or reject any suggested policies, procedures or examinations.

**III. ARGUMENT**

    **A.    A Preliminary Injunction Should Not Be Issued.**

The Third Circuit has repeatedly held that for a preliminary injunction properly to issue, a moving party must demonstrate:

> (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured pendente lite if relief is not granted.  Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons

from the grant or denial of the injunction, and
(4) the public interest.

In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137,
1143 (3d Cir. 1982), quoting, Oburn v. Shapp, 521 F.2d 142, 147
(3d Cir. 1975) (citations omitted).   See also SI Handling
Systems, Inc. v. Heisley, 753 F.2d 1244, 1254 (3d Cir. 1985);
Continental Group, Inc. v. Amoco Chemical Corp., 614 F.2d 351,
356-357 (3d Cir. 1980).

The Court should deny plaintiff's motion for a
preliminary injunction.  Plaintiff cannot prove a likelihood of
success on the merits of her claims or demonstrate irreparable
harm.[4]  Moreover, the public interest strongly disfavors the
injunction sought.

    **1.**   **Plaintiff Cannot Demonstrate A Likelihood Of
Success On The Merits.**

        **a.**   **Plaintiff Cannot Succeed In Her Claims
Because She Is Seeking to Have this Court
Second-Guess The Vast Medical, Academic,
Statistical And Other Expertise In The
USMLE™.**

Plaintiff is asking this Court to rewrite the
professional standards by which the NBME and FSMB develop,
administer and score the USMLE™ and, in turn, to lower the

---

[4] Plaintiff's injunction request is also flawed because the
"remedies" she seeks are not clear and appear inconsistent.  For
example, she states that the relief she seeks is an order compelling
the Commonwealth to give her a hearing that the NBME notify her
residency program that her failing grades have been rescinded.  Mem.
of Law, pp. 3-4 and proposed order.  She also asserts, however, that,
as a matter of law, she passed the examination and is entitled to a

minimum passing standard set by the examination.  She wants to pass the test without achieving a passing score.  She wants to have questions that she does not like declared improper; and she wants material that was not utilized in determining her reported score, but that she believes she answered correctly, to be scored in her favor.  None of these requests is remotely supported by law.

As previously explained, the USMLE™ is developed by medical educators and clinicians from around the country.  They spend countless hours developing the material on the examination and decide minimum passing scores and certain other test-administration issues.  They serve the same function as medical school faculty do in making academic judgments.  Courts have historically refrained from second-guessing such academic and medical expertise and judgments.

In Regents of University of Michigan v. Ewing, 474 U.S. 214 (1985), the University of Michigan dismissed a medical school student because he had failed the "Part I" examination given at that time by the National Board of Medical Examiners, the passage of which the University of Michigan Medical School required as a mandatory prerequisite for continued enrollment in its M.D. program.  The student claimed that other students were permitted to retake the exam and that his dismissal was

---

license now, which suggests that the Court could find that she is entitled to an unrestricted medical license.  Memorandum, pp. 6-7.

arbitrary and capricious and violated his "substantive due process rights" under the Fourteenth Amendment.  In refusing to substitute its academic judgment for the judgment of the faculty of the University of Michigan (which relied upon an NBME examination), the Supreme Court stated:

> When judges are asked to review the substance of a generally academic decision . . . they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

Regents of University of Michigan, 474 U.S. at 225.

The Supreme Court recognized the need for judicial restraint when faced with challenges to academic decisions:

> If a "federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies," Bishop v. Wood, 426 U.S. at 349, 96 S.Ct. at 2079 . . . far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions -- decisions that require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision-making." Board of Curators, Univ. of Missouri v. Horowitz, 435 U.S. at 89-90, 98 S.Ct., at 954-955.

Regents of University of Michigan, supra, 474 U.S. at 226. [5]

---

[5] The Regents of University of Michigan case involved a state actor; that is, a public institution subject to constitutional due process and equal protection restraints.  One would expect courts to exercise even greater restraint in second-guessing private institutions and non-profit corporations.  See, e.g., Swartley v.

In <u>Connelly v. University of Vermont and State Agricultural College</u>, 244 F. Supp. 156 (D.Vt. 1968), the District Court refused to substitute its judgment for the decision by the university that a medical student should be required to pass a pediatrics-obstetrics course in order to obtain a medical degree, holding that:

> The rule of judicial nonintervention in scholastic affairs is particularly applicable in the case of a medical school. A medical school must be the judge of the qualifications of its students to be granted a degree; Courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine.

<u>Connelly</u>, 244 F. Supp., at 160-161. Similarly, in <u>Jansen v. Emory University</u>, 440 F. Supp. 1060 (N.D. Ga. 1977), aff'd, 579 F.2d 45 (5th Cir. 1978), the court upheld a private university's dismissal of a dental student for academic reasons, declining to adjudicate the fairness of grades because "Courts are . . . no more qualified in dentistry than in medicine," <u>Jansen</u>, <u>supra</u>, at 1063.

These cases make clear that

> University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.

<u>Regents of University of Michigan</u>, <u>supra</u>, 474 U.S. at 225, n. 11 (citation omitted).

---

<u>Hoffner</u>, 734 A.2d 915, 921 (Pa.Super. 1999)(refusing to second-guess denial of Ph.D. by Lehigh University, a private university).

21

These principles of academic deference are equally applicable to the expertise of the NBME and FSMB, which develop and administer the licensing examinations that ensure that only doctors who have demonstrated sufficient skill and competence are permitted to practice medicine on patients.   These examinees, once licensed, will hold patients' lives and health in their hands.   Plaintiff has not and cannot demonstrate that the minimum standards set by the hundreds of highly skilled professionals who have created the USMLE™ should be reset by this Court.

> **b.   Plaintiff Has No Reasonable Likelihood Of Success On Her Breach Of Contract Claim Against NBME In Count VI Of Her Complaint.**

Plaintiff has no likelihood of prevailing on her claim that the NBME breached a contract with her.   Complaint, Count VI.   To state a breach of contract claim against a private academic organization, such as the NBME, plaintiff must point to its failure to meet "specific terms in brochures, course offering bulletins, and other official statements, policies and publications of the institution." <u>Swartley v. Hoffner</u>, 734 A.2d 915, 919 (Pa.Super. 1992); <u>Cavaliere v. Duff's Business Institute</u>, 605 A.2d 397, 404 (Pa.Super. 1992).   <u>Swartley</u> involved a breach of contract claim against a private university and <u>Cavaliere</u> a breach of contract claim against a trade school. The Superior Court rejected the contract claims because

plaintiffs failed to show the violation of any term in an official written school document.  <u>Swartley</u>, 734 A.2d at 919; <u>Cavaliere</u>, 605 A.2d at 404.

Here, plaintiff identifies the 2006 Bulletin of Information (Exhibit 7) as the contract that the NBME and FSMB supposedly breached.[6]  She does not identify which parts of that 39 page document contain the contractual terms with which the NBME supposedly did not comply.  Rather, she alleges vaguely that there was a contract breach because NBME did not "correctly score [her] examination and did not "reevaluate and rescore [her] examination in response to her various requests . . .." Complaint, ¶¶84-85.

Plaintiff does not identify how the NBME failed to comply with any of its written representations about scoring, which are contained at pp. 27-29 of Exhibit 7, investigating reports of problems, which are contained at p. 34 of Exhibit 7, or any other matter.

Plaintiff's contract breach allegations are deficient on their face.[7]  Plaintiff has not pleaded (and cannot in accordance with Rule 11) plead a proper breach of any provision of any written contractual document as required by Pennsylvania

---

[6] It should be noted that the 2006 Bulletin did not even exist when Plaintiff took her July 2005 Step 3 examination.

[7] The NBME scored her July 2005 Step 3 examination and investigated her problem reports for that examination entirely in accordance with the 2005 Bulletin of Information, pp. 26-28 (Exhibit 6).

law.  She certainly has no reasonable likelihood of prevailing on such a claim.

> **c.   Plaintiff Has No Reasonable Likelihood Of Success On Her Negligence Claim Against NBME And FSMB In Count VII Of Her Complaint.**

Plaintiff asserts that NBME and FSMB failed to "exercise reasonable care in the administration and scoring of the Step 3 portion of Plaintiff's USMLE™."  Complaint, ¶88. Plaintiff must plead the following to state a negligence claim:

> (1) a duty, recognized by law, requiring the actor to conform to a certain standard with respect to the injured party;  (2) a failure of the actor to conform to that standard;  (3) a causal connection between the conduct and the resulting injury;  and (4) actual loss or damage . . .

Fritz v. Glen Mills School, 894 A.2d 172, 176 (Pa.Cmwlth. 2006).

Plaintiff's negligence claim is an invitation for this Court to second-guess the hundreds of experts who develop the USMLE™.  Plaintiff identifies as negligence that NBME and FSMB did not (1) pass her on the Step 3 examination; (2) reevaluate her examination in the manner she requested; and (3) consider her supposed "expert's" opinion about several examination questions.  Complaint, ¶¶88-92.  These allegations simply inflate Plaintiff's disagreements with NBME and FSMB into allegations of negligence.  The fact that the NBME and FSMB did not accede to plaintiff's demands does not constitute "negligence."

24

Fortunately for the citizens of Pennsylvania, the law does not permit plaintiff to concoct such a claim challenging academic and medical judgments, unless they violate the express terms of a written contract.

In Cavaliere v. Duff's Business Institute, supra, the plaintiff sued a private court reporting trade school for both breach of contract and negligence.   The Pennsylvania Superior Court surveyed case law nationwide, recognized the deference that courts give to academic judgments, and sustained the dismissal of both the breach of contract and negligence counts because the plaintiff did not plead and could not prove that there was a breach of any identifiable promise or representation contained in the school's written materials:

> We are persuaded by the reasoning employed by the many
> courts that have refused to recognize a general cause
> of action for educational malpractice, whether framed
> in terms of tort or breach of contract, where the
> allegation is simply that the educational institution
> failed to provide a quality education.   It would be
> unwise to inject the judiciary into an area where it
> would be called upon to make judgments despite often
> insurmountable difficulties both in the formulation of
> an adequate standard of care and in finding a causal
> link between the alleged breach and the alleged
> damages.
>
> . . .
>
> The difficulty with the instant lawsuit is simply
> that plaintiffs' complaint amounts to a general
> allegation of a lack of a quality education, without
> more.   The complaint does not allege that there was
> any specific undertaking, in the student handbook and
> catalog or otherwise, to provide a specific course of
> instruction which was not provided.   There is no

allegation that any of the courses which the handbook included in the school's curriculum were not offered. Nor does the complaint allege that the representations made by the Institute to the effect that it was approved by the NSRA or PHEA were false. Finally, there is no pleading of any other specific misrepresentation or failure to perform a contractual undertaking. . . . Such a complaint is clearly insufficient.

<u>Cavaliere v. Duff's Business Institute</u>, 605 A.2d at 403-404.

In the preparation and administration of the USMLE™, the NBME and FSMB (1) made extensive preparatory materials available to plaintiff, Content Description and Sample Test Materials (Exhibit 8); (2) provided a Bulletin of Information (Exhibit 6) that explained the examination and its procedures; (3) followed the scoring procedures in the 2005 Bulletin of Information (Exhibit 6); and (4) investigated her concerns about the July 2005 Step 3 examination. (Exhibit 5).

Plaintiff cannot point to any promise or representation that the NBME or FSMB made in any respect that was false or was breached. Accordingly, plaintiff has no reasonable likelihood of prevailing on her negligence claim.

> **d.    Because No State Action Exists Here, There Is No Likelihood Plaintiff Will Prevail On Her Section 1983 And Associated Conspiracy Claims Against NBME And FSMB (Complaint, Counts I, II, IV And V).**

It is difficult to understand from plaintiff's complaint exactly what her federal civil rights causes of action are. However, irrespective of whether they are claims of

26

national origin discrimination or some other cause of action, plaintiff cannot succeed on her 42 U.S.C. §1983 claims (Counts I and II) because NBME and FSMB are not state actors.   §1983 provides an action for violation of constitutional rights "under color of state law."  <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 924 (1982).   A §1983 claim cannot exist without state action, <u>id</u>., and none exists here.   Because plaintiff's §1983 claims fail, so do her 42 U.S.C. §§1985 and 1986 conspiracy claims (Counts IV and V) because they cannot be maintained in the absence of a viable §1983 claim.   <u>In re Orthopedic Bone Screw Products Liability Litigation</u>, 193 F.3d 781,789 (3d Cir. 1999).

### i.   Plaintiff's §1983 Claims Fail for Absence of State Action.

The Seventh Circuit has already considered whether the NBME and FSMB are state actors and affirmed the dismissal of §1983 claims against FSMB and NBME for lack of state action. <u>See</u> <u>Brown v. Federation of State Medical Boards of the United States, et al.</u>, 830 F.2d 1429, 1437 (7th Cir. 1987), <u>abrogated on other grounds</u>, 880 F.2d 928 (7th Cir. 1989).[8]

---

[8] The district court decision that the Seventh Circuit affirmed held that both the FSMB and NBME were not state actors as follows:

Brown's § 1983 action (along with his other constitutional claims) fail for lack of subject matter jurisdiction because no state action or acts under color of state law occurred.  In order to claim an infringement of constitutional rights under the Fourteenth Amendment or § 1983, a plaintiff must allege that his injury was caused by state actors or persons acting under color of state law. <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 835 (1982).  The tests

27

In <u>McKeesport Hospital v. Accreditation Council for
Graduate Medical Education</u>, 24 F.3d 519 (3d Cir 1993) (Yohn, J.
sitting by designation), the Third Circuit rejected a §1983
claim against the Accreditation Council for Graduate Medical
Education (the "Council"), which is a private organization
authorized by Pennsylvania's Medical Practice Act of 1985 to
make accreditation decisions regarding graduate medical
programs.  The Council's recommendation caused the Commonwealth
to withdraw the accreditation for McKeesport Hospital's general
surgery residency program.  This Court analyzed the connection
between the Council and the Commonwealth of Pennsylvania and

---

for state action and acts under color of law are the same,
see <u>Annunziato v. The Gan, Inc.</u>, 744 F.2d 244, 249 (2d Cir.
1984): the question is whether the defendant misused power
possessed by virtue of state law and made possible only
because the wrongdoer is clothed with the authority of
state law. <u>See Monroe v. Pape</u>, 365 U.S. 167, 184 (1961).
This does not mean that the defendant must be a state
officer; however, a private party can incur liability only
when he is a 'wilful participant in joint activity with the
State or its agents.' <u>See</u> <u>Annunziato</u>, 74 F.2d at 250,
<u>citing</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 152
(1970).

Federation, Commission and National are not state agencies.
They do not license physicians. The actual state actors
here are the state licensing boards, which have complete
control over whether or not to use the defendants' tests,
and if so, how to use these tests. Thus, the defendants are
supplying a service used by candidates and state boards.
This supplying of a testing service does not make
defendants state actors any more than the company which
provides the state with office supplies acts under color of
state law. The state boards are at most defendants'
consumers; defendants do not participate in a state
activity.

<u>Brown v. Federation of State Medical Boards of U.S., et al.</u>, 1985
WL 1659, *4 –5  (N.D.Ill. 1985).

28

determined that the Council was not a state actor subject to potential liability under §1983.

The Third Circuit in <u>McKeesport</u>, 24 F.3d at 523-26, examined the trilogy of U.S. Supreme Court cases, <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922 (1982), <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830 (1982), and <u>Blum v. Yaretsky</u>, 457 U.S. 991 (1982), which together established the modern standard for determining when a private organization is deemed to be a state actor. Applying the analyses of those cases, the Third Circuit found that the Council was not a state actor because: (1) the Council did not act in concert with the state (<u>id</u>., at 524); (2) there was not a "close nexus" between the Council and state (<u>id</u>.); and (3) accreditation of graduate medical programs was not exclusively a state responsibility. (<u>id</u>.).[9]

Because of the enormous number of similarities between the Council in <u>McKeesport</u> and the NBME and FSMB in this case, the chart below compares the separation and relationship between

---

[9] The same parties and dispute involved in <u>McKeesport</u> gave rise to Pennsylvania state court litigation in which the Pennsylvania Supreme Court, like the Third Circuit, found the Council to be a private organization, not a state actor.  <u>McKeesport Hospital v. Pennsylvania State Board of Medicine</u>, 652 A.2d 827, 830 (Pa. 1995).

> <u>Accrediting bodies are separate and independent from the [state] board</u>.  Their actions are not within the board's ambit. Review of their actions occurs through their own internal appeals procedures, such as the procedures that were in the present case utilized and exhausted by McKeesport Hospital.

<u>Id</u>., at 830. (emphasis added).

the Council and the Commonwealth of Pennsylvania, which the
Third Circuit found dispositive in holding that the Council was
not a state actor, and the separation and relationship between
the private defendants here and the Commonwealth of
Pennsylvania.

| McKeesport Case | Partem Case |
|---|---|
| 63 P.S.A. ¶¶422.1—422.25;<br>49 Pa.Code §17.23 – Permit Council to act as an accrediting body.<br>(24 F.3d at 520-21) | 63 P.S. §422.24(c) – Permits NBME and FSMB to prepare and administer the USMLE™.<br>49 Pa.Code §17.1 – Designates USMLE™ as acceptable examination in PA |
| Council has its own set of accreditation standards: *The Essentials of Accredited Residencies*.<br>(24 F.3d at 521) | NBME and FSMB set USMLE™'s questions and standards. (Examiner, Exhibit 10, pp. 1 and 5)  The NBME and FSMB publish their own Bulletins of Information explaining exam standards and procedures.  (Exhibits 6 and 7, 2005 and 2006 Bulletins of Information) |
| Council has residency review committees to carry out its work.<br>(24 F.3d at 521) | NBME and FSMB utilize committees to develop the USMLE™. (Examiner, Exhibit 10, pp. 1 and 5). |
| Hospitals ask the Council for reconsideration of accreditation decisions.<br>(24 F.3d at 522) | Examinees request NBME/FSMB to conduct score rechecks and investigate exam problems. (Exhibit 6, 2005 Bulletin of Information, pp. 27 and 33) |
| No state officials participate in the Council's accreditation decisions.<br>(24 F.3d at 524) | No state officials participated in any decision on plaintiff's Step 3 examination or on examination scoring generally. |
| Accreditation of hospital residency programs is not exclusively a state function.<br>(24 F.3d at 524-25) | Developing and administering the USMLE is not exclusively a state function and requires academic and scientific expertise the NBME and FSMB uniquely provide. (Examiner, Exhibit 10). |

| McKeesport Case | Partem Case |
|---|---|
| The Council is a private organization that is self-governed and financed. (24 F.3d at 525) | NBME and FSMB are private organizations that are self-governed and financed.  NBME and FSMB co-own the USMLE and have proprietary trademark and copyright interests in it. (Exhibit 1, NBME Statement of Guiding Principles) |
| The state does not control the Council's decision-making process. (24 F.3d at 525) | The state does not control NBME's and FSMB's development or scoring of the USMLE. (Exhibit 3, FSMB Contract with State, p.4, ¶G). |

In Goussis v. Kimball, 813 F.Supp. 352 (E.D.Pa. 1993), a foreign born and trained physician sued under 42 U.S.C. §1983 after repeatedly failing the American Board of Internal Medicine's ("ABIM") qualifying examination for medical subspecialty certification in endocrinology and metabolism.  He claimed discrimination due to his national origin and foreign medical training.  Id., at 353.  The Court rejected state action arguments similar to plaintiff's here, finding ABIM is a private entity, acting on its own, with no ties to any government.  Id. at 357-58.

Irrespective of what plaintiff's §1983 claims actually are, they have no likelihood of success because the NBME and the FSMB are not state actors.

> ### ii.  Plaintiff's Conspiracy Claims Fail Because She Lacks A Predicate §1983 Tort Claim.

Because plaintiff's §1983 claims have no likelihood of success for lack of state action, her conspiracy claims, which

"require[] a separate underlying tort as a predicate for liability . . . ." similarly fail.  <u>See</u> <u>In re Orthopedic Bone Screw Products Liability Litigation</u>, 193 F.3d 781, 789 (3d Cir. 1999).  Without viable §1983 claims, which are predicate torts, plaintiff cannot maintain her conspiracy claims.  Therefore, there is no likelihood of success on plaintiff's conspiracy claims.

> **2.   Plaintiff Cannot Show Irreparable Harm.**

Plaintiff cannot demonstrate that she will suffer irreparable harm in the absence of an injunction.  The Third Circuit explained the standard as follows:

> We have said that the requisite feared injury or harm must be irreparable--not merely serious or substantial.  "The word means that which cannot be repaired, retrieved, put down again, atoned for . . . . Grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money.  The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it . . . "

<u>Glasco v. Hills</u>, 558 F.2d 179, 181 (3d Cir. 1977).

Plaintiff cannot demonstrate that an injunction now is necessary to prevent any immediate or irreparable harm.[10] Obviously, if plaintiff prevailed at trial, the Court could issue a judgment for monetary damages.  Plaintiff's only

---

[10]  The Commonwealth correctly points out that there is no fundamental right to obtain a license to practice medicine or any other profession.  Defendant State Board of Medicine's Mem. of Law In Support of Motion to Dismiss, p. 10.  Plaintiff's claim of an

justifications for immediate injunctive relief are (1) plaintiff may be delayed in pursuing her medical career and (2) plaintiff will lose her residency position at Bryn Mawr Hospital. Neither is a basis for injunctive relief.

As to delay, even with the substantial caseload in this Court, a trial on plaintiff's permanent injunction request could easily occur in one year. A delay in education of one year or more, and the resulting career delay, do not constitute irreparable harm. See Sohmer v. Kinnard, 535 F. Supp. 50, 52 (D. Md. 1982) (The plaintiff, who had been expelled from a school of pharmacy because of a drug abuse incident, would not be irreparably harmed by reason of a delay in his studies. "[Plaintiff] had not been forever barred from completing his education at the School of Pharmacy. . . . [a] mere delay in plaintiff's entry into the profession does not constitute irreparable harm. He may use that period to develop his professional skills . . ., and if plaintiff prevails at trial, money damages could compensate him for the loss of earnings due to the one year delay."); Bleicker v. Board of Trustees of Ohio State, 485 F. Supp. 1381, 1388-1389 (S.D. Ohio 1980) (Court did not find delay of one year in course of study at veterinary school to constitute irreparable harm noting "that if plaintiff is required to prolong her studies, she will not be foreclosed

irreparable injury of a constitutional magnitude is without any basis in law.

from improving her professional skills and working with patients during the prelicense period."); Timmerman v. University of Toledo, 421 F. Supp. 464, 466 (N.D. Ohio, 1976) (finding that a law student would not suffer irreparable injury by delay in attendance at law school and holding that "there is [no] fixed time limit, beyond which no one can embark on the study of law. The defendant has enrolled, and probably has presently enrolled, students twice the age of the plaintiff, for this is customary in the profession.  If there is no time limit, by what standard can a delay of a year, or even several years, be considered as irreparable harm?"); Boehm v. University of Pennsylvania School of Veterinary Medicine, 573 A.2d 575, 586 (Pa. Super. 1990), allocatur denied, 589 A.2d 687 (1990) (no irreparable harm due to delay in education of two veterinary students suspended for academic dishonesty).

Since this Court can grant the relief plaintiff requests if she were somehow able to prevail at trial, and since whatever damage she might suffer by her career delay is not irreversible and could be compensated in monetary damages, plaintiff cannot meet the burden of showing irreparable harm.

Nor is plaintiff's loss of her residency position irreparable harm.  The loss of a job, even permanently, is not irreparable harm that justifies an injunction because it can be remedied with money damages and other relief.  Roberts v. Van

<u>Buren Public Schools</u>, 731 F.2d 523, 526 (8th Cir 1984) (job loss was not irreparable harm supporting injunction); <u>Hohe v. Casey</u>, 868 F.2d 69, 73 n.6 (3d Cir. 1989) (citing <u>Roberts</u> with approval); <u>E. St. Louis Laborers Local v. Bellon Wrecking & Salvage Co.</u>, 414 F.3d 700, 704-05 (7th Cir. 2005)("A permanent loss of employment, standing alone, does not equate to irreparable harm.")

### 3. Allowing Plaintiff to Pass the USMLE™ with a Failing Score Would Harm The Public Interest and the NBME and FSMB.

The USMLE™ is a critical component of the licensing process on which the citizens of this country depend to ensure that those who practice medicine, without supervision, on the general public, have a minimum level of knowledge and competency.

The integrity of the processes by which NBME and FSMB develop and administer the USMLE™ would be severely damaged if the Court were to issue the injunction requested by plaintiff. Not only would such an order have the effect of substituting this Court's medical judgment for the judgment of the many medical educators, clinicians and testing professionals who develop and administer the USMLE™, but it would also encourage disgruntled examinees to resort to the courts whenever they are dissatisfied with their results on Steps 1, 2 or 3 of the USMLE™.

35

This case is a perfect illustration of the problem. Plaintiff, an examinee who has failed the USMLE™ 13 times and Step 3, about which she complains in this case, 5 times, is challenging fundamental aspects of the examination, such as how it should be scored and what is a proper passing grade.  Putting aside the lack of any discernable cause of action, the harm to the public interest and to the NBME, FSMB and the USMLE™ process, far outweighs the interest of a single examinee.  See Sohmer v. Kinnard, 535 F. Supp. at 53.  The harm caused by an injunction like the one that plaintiff seeks is not only to the public interest, but also to the integrity of the academic and credentialing institutions.  See Bleicker v. Board of Trustees of Ohio, 485 F. Supp. at 1389.

As the Court in Bleicker noted:

> . . . [D]efendants have a considerable interest in protecting the integrity of their published academic standards and disciplinary regulations. Intervention of the Court into the affairs of the Veterinary [School] would substantially weaken its legitimate authority among its own students and members of the veterinary profession generally, a result that would significantly disserve the public interest.

Id. at 1389.

In a case in the United States District Court for the District of Arizona in which the plaintiff sought a preliminary injunction ordering the NBME to grant him double time to take the USMLE™ and administer the test immediately, the District

Court denied the request for a preliminary injunction stating tersely but eloquently:

> Plaintiff graduated from medical school over ten years ago.  Under these circumstances, we fail to see why things are urgent now.  And finally, we do not believe the public interest would be advanced by allowing the plaintiff to take the tests under conditions favorable to him.  The public's interest is advanced when the defendant does its job to ensure that only those who are qualified will be licensed to practice medicine in the United States.  Malpractice and poor medical care is widespread thus suggesting that the present standards may be too low.  The public's interest would not be served by lowering the bar further.

<u>Krolik v. National Board of Medical Examiners</u>, U.S.D.C., Dist. Of Ariz., Civil Action No. CV-05-0315-PHX-FJM (Martone, J.), Order dated January 19, 2006 at p. 3.  A copy of this Order is appended to this Memorandum of Law.

Likewise, in this case, plaintiff cannot show that the balance of equities will be served by "lowering the bar further" to permit her to pass the USMLE™ with a failing grade.

**IV.   CONCLUSION**

      For all of the reasons stated above, this Court should deny plaintiff's motion for a preliminary injunction.

                Respectfully yours,

                NH1402
                _____
                Neil J. Hamburg, Esquire
                Craig D. Ginsburg, Esquire
                Id. Nos. 32175 and 56445
                HAMBURG & GOLDEN, P.C.
                1601 Market Street, Suite 3310
                Philadelphia, PA 19103-1443
                (215) 255-8590

                Attorneys for Defendants
                National Board of Medical
                Examiners and Federation of
                State Medical Boards of the
                United States, Inc.

## CERTIFICATE OF SERVICE

I, Neil J. Hamburg, certify that on June 19, 2006, the foregoing Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction and proposed order have been filed electronically and are now available for viewing and downloading from the Court's Electronic Case Filing System.  I further certify that I served a copy of the foregoing memorandum and proposed order by regular mail on:

Frank Finch, III, Esquire
Two Penn Center Plaza, Suite 950
15th & John F. Kennedy Boulevard
Philadelphia, PA  19102

John O. J. Shellenberger, III, Esquire
Beth Ann Smith, Esquire
Office of the Attorney General
Commonwealth of Pennsylvania
Civil Law Division, Eastern Regional Office
21 South 12th Street
Philadelphia, PA  19107-3603

NH1402
Neil J. Hamburg